Entered: October 30th, 2024
Signed: October 30th, 2024



**MICHELLE M. HARNER**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

|  |  |  |
|---|---|---|
| In re: | * | |
| | * | |
| Arlene Delores Klemkowski, | * | Case No. 22-10257-MMH |
| | * | |
| Debtor. | * | Chapter 13 |
| *    *    *    *    *    * | * | |
| | * | |
| Arlene Delores Klemkowski, | * | |
| | * | |
| Movant, | * | |
| | * | |
| v. | * | |
| | * | |
| CitiMortgage, Inc., et al., | * | |
| | * | |
| Respondents. | * | |
| *    *    *    *    *    *    * | * | *    *    *    *    *    * |

### <u>MEMORANDUM OPINION</u>

An individual who is facing financial distress—often the potential loss of her home—and turns to chapter 13 of the Bankruptcy Code[1] for relief should be given a fair and just opportunity to rehabilitate her finances. She should not face artificial barriers or arbitrary decisions imposed by her prepetition creditors. Yet, in the pending matter, a debtor faced losing her home because

---

[1] 11 U.S.C. §§ 101 et seq. (the "Code"). The Court sets forth certain references and citations in the footnotes of this Opinion solely to allow for the provision of more (rather than less) information; the use of footnotes is not intended to minimize the importance of the materials or their relevance to the Court's holding.

her mortgage servicer refused to continue its prepetition practice of accepting electronic payments from the debtor, solely because she had filed a bankruptcy case.

A debtor in a chapter 13 case must comply with various obligations under the Code and successfully complete a three- to five-year repayment plan before she may receive her bankruptcy discharge. The process is not easy, and, for many individual debtors, it can be overwhelming. Yet, chapter 13 works, and it can provide much-needed relief to debtors and payments to creditors. But that potential relief can be delayed or denied altogether if the debtor, for example, misses her mortgage payment, misses time from work, or otherwise incurs unanticipated costs in the performance of her duties under the Code.

Where, as here, a creditor elects to change a debtor's rights or obligations under the parties' prepetition agreements, a debtor may be unable to easily adjust her performance under the agreement (or be unaware of the change) and inadvertently default. The debtor in this matter used an electronic payment portal offered by the servicer until her access was shut off upon the bankruptcy filing. She then defaulted under the agreement and had to defend a motion for relief from the automatic stay filed by the servicer. The stay motion was resolved by consent, but the servicer refused to reinstate the debtor's ability to make electronic payments. The debtor now asks this Court to compel the servicer to provide such access.

The Court finds the servicer's position troubling on several fronts. The servicer's decision to deny the debtor access to the online payment portal makes it more difficult and time-consuming for the debtor to make her payments and removes a commonly used payment method from the debtor's toolkit. Although policies underlying the Code and consumer protection laws would suggest we collectively find ways to make it easier for individual debtors to make their payments

and comply with their obligations, the servicer's conduct moves the debtor and this case sharply in the opposite direction.

The Court is bound by the language of the Code and the parties' prepetition agreements. The debtor did have a prepetition contractual "right to use" the online portal that came into the bankruptcy estate through the debtor's legal and equitable interests in the parties' prepetition agreements. Moreover, the servicer's decision to unilaterally restrict this right by denying the debtor access to the online portal effectively terminated the relevant agreement and violated the automatic stay of section 362(a)(3) of the Code. Nevertheless, the debtor did not provide any support for an award of monetary damages under section 362(k) of the Code, and the Court finds no basis on the particular facts and posture of this matter to grant any such relief.

The conclusion that relief under section 362(k) of the Code is not available in this matter does not end the Court's inquiry. An action violating the automatic stay is void ab initio. The Court cannot allow a void action (or an ongoing violation of the statutory injunction) to go without remedy. The Court thus will continue the Motion to allow the parties an opportunity to further address an appropriate remedy under the facts of this case and the terms of this Opinion and the related Order.

## I. Relevant Background

Ms. Arlene Delores Klemkowski, the above-captioned debtor (the "Debtor"), filed a petition for relief under chapter 13 of the Code on January 19, 2022. ECF 1. The Debtor also filed, and then amended, her proposed chapter 13 plan, which the Court confirmed on August 18, 2022. ECF 2, 28, 32. The Debtor has been making her payments to the Chapter 13 Trustee as required

by the plan and has otherwise complied with her duties and obligations as a chapter 13 debtor under the Code.

The pending matter concerns the Debtor's Motion to Require Creditor to Accept Electronic Payment (the "Motion"). ECF 46. By the Motion, the Debtor asks the Court to require Citimortgage, Inc. and Cenlar FSB, as servicer (the "Servicer"), to accept the Debtor's monthly mortgage payments through the Servicer's website and online portal (referred to herein as the "online portal"). The Debtor argues that she routinely used the online portal to make her payments prior to the petition date and that the Servicer has not offered any valid reason for blocking her attempts to use this payment method during her bankruptcy case. The Servicer filed an opposition to the Motion, asserting that it is "impossible" to allow the Debtor to use the online portal because the Servicer's systems cannot, among other things, distinguish between borrowers who are in bankruptcy and those who are not. ECF 49. The Servicer also notes that it generally restricts access to the online portal for any borrower in default and that, from its perspective, use of the portal is a convenience and not a right.

The Court held a preliminary hearing in this matter on May 13, 2024. The Court then entered a Preliminary Order, which set deadlines for additional briefing and identification of supplemental evidence. ECF 64. The Court held a further evidentiary hearing on August 15, 2024 (the "August Hearing"). The parties have presented their evidence and arguments on the record at the hearings and have filed post-hearing briefs. The Court likewise has had a full opportunity to review the record and study the applicable law. This matter is now ripe for resolution.[2]

---

[2] The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334. The District Court has referred this case and this matter to this Court under 28 U.S.C. § 157(a) and Local Rule 402 of the United States District Court for the District of Maryland. This matter is a "core proceeding" under 28 U.S.C. § 157(b)(2). This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52, made applicable to this matter by Bankruptcy Rules 7052 and 9014. The Court details herein its factual findings necessary to resolve the disputed legal issues. *See, e.g.*, *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 (2018).

## II.    Findings of Fact and Conclusions of Law

Chapter 13 of the Code allows a debtor to restructure her financial obligations through a three- to five-year repayment plan.[3] In addition, a debtor may "cure and maintain" payments on her prepetition mortgage obligations during the term of the repayment plan.[4] In this district, that approach requires a debtor to make two separate monthly payments: (i) one to the Chapter 13 Trustee under the plan (the Trustee, in turn, makes payments to the mortgage lender on account of any prepetition arrearages); and (ii) one directly to the mortgage lender or servicer for the debtor's postpetition obligations under the mortgage. In this district, the debtor has the option to make her monthly payments to the Chapter 13 Trustee electronically through an online payment platform. The mode of payment for the debtor's postpetition obligations to the mortgage lender, however, is generally governed by the parties' prepetition agreements or by consent of the parties.

In this case, the Debtor has been making her payments to the Chapter 13 Trustee as required by her chapter 13 plan but has had difficulty making her postpetition mortgage payments to the Servicer. She alleges that her difficulty stems, in large part, from the Servicer's refusal to allow her to submit payments through the online portal. The Servicer argues that the Debtor has no right to use the online portal and that, in any event, the request is impossible to implement. The Court evaluates the parties' respective positions below, first by considering key aspects of the factual record and then, second, by evaluating those and other findings of fact in the context of applicable law.

---

[3] *See, e.g.*, *Hurlburt v. Black*, 925 F.3d 154, 158 (4th Cir. 2019) ("Congress enacted the 1978 Bankruptcy Reform Act with the overarching goal of providing debtors with a 'fresh start.' H.R. Rep. No. 95-595, at 118 (1978). Among other changes, Congress significantly revamped Chapter 13 to better 'facilitate adjustments of the debts of individuals with regular income through flexible repayment plans funded primarily from future income.' 8 Collier on Bankr. (MB) ¶ 1322.01 (2018)."); *see also Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007) ("[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor'") (internal quotation marks omitted) (citing *Grogan v. Garner*, 498 U.S. 279 (1991)).
[4] 11 U.S.C. § 1322(b)(5).

A.    <u>Findings of Fact</u>[5]

The Debtor testified in support of the relief requested by the Motion. The Court found the Debtor to be forthcoming in her answers and credible on the witness stand. The Debtor stated that she always made her monthly mortgage payments electronically, through an online portal, prior to her bankruptcy filing. *See, e.g.*, Tr. Aug. Hrg. 21–22.[6] The Debtor indicated that she used this electronic payment method even after the Servicer took over her loan. The Debtor explained that the Servicer made the online portal available to her to make her mortgage payments. The Debtor set up her account with the Servicer and continued her practice of making electronic payments. The Debtor's testimony suggested that she was surprised by the Servicer's change in permissible payment methods after she filed her bankruptcy case. The Servicer did not deny that the Debtor made, and it accepted, electronic payments prior to the bankruptcy case. *See, e.g.*, Tr. Aug. Hrg. 35, 76–78.

The Servicer's witness, Mr. Ray Crawford,[7] explained that it was the Servicer's policy to restrict debtors' access to the online portal upon their bankruptcy filing.[8] *See, e.g.*, Tr. Aug.

---

[5] The Court relies only on witness testimony specifically identified in this Opinion. Testimony not specified herein was either inadmissible, irrelevant, not helpful to the Court's evaluation of the issues, or not credible. In addition, to the extent that either party raised a relevancy objection to any part of the testimony included in this Opinion, the Court evaluated the objection under Federal Rule of Evidence 401 and found the testimony helpful to the Court's analysis of the issue and that any potential prejudice was significantly outweighed by the value of the testimony to the Court's consideration of this matter. *See* Notes of Advisory Committee on Proposed Rules to Fed. R. Evid. 401("Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. Does the item of evidence tend to prove the matter sought to be proved? Whether the relationship exists depends upon principles evolved by experience or science, applied logically to the situation at hand. George F. James, *Relevancy, Probability and the Law*, 29 CALIF. L. REV. 689, 696, n.15 (1941), in Selected Writings on Evidence and Trial 610, 615, n.15 (Fryer ed. 1957)."); *see also U.S. v. Tillmon*, 954 F.3d 628, 643 (4th Cir. 2019).

[6] All citations to "Tr. Aug. Hrg." refer to the transcript of the August Hearing, which is docketed at ECF 88.

[7] Mr. Crawford is a Senior Litigation Associate at Cenlar FSB.

[8] Mr. Crawford testified that several events may change the status of a borrower's account and access to the online portal. For example, if a borrower defaults, the Servicer may restrict the account. Tr. Aug. Hrg. 36. Moreover, once the borrower files for bankruptcy, the Servicer places a bankruptcy code on the borrower's account, which stops the platform from interacting with the borrower's/debtor's account; the debtor no longer has access to information online or an ability to pay online. *Id.* The Court notes that the Debtor's counsel objected to Mr. Crawford's testimony on these issues. *Id.* at 36–38. The Court sustained that objection in part but allowed the Servicer's counsel to lay the

Hrg. 36, 41–42, 44. He provided several reasons why the Servicer takes this approach, including wanting to provide debtors with accurate information regarding their accounts and to avoid potential violations of the automatic stay. *See, e.g.*, Tr. Aug. Hrg. 40–43. He stated that the current system cannot manage accounts for both borrowers who have, and those who have not, filed for bankruptcy. As a result, all notices and account information would go to debtor borrowers if the Servicer did not place a bankruptcy code on those accounts and remove them from the normal operation of the online portal. Tr. Aug. Hrg. 41–43.

The Court found Mr. Crawford to be professional and direct on the stand, and knowledgeable concerning his areas of responsibility at the Servicer. The Court notes, however, that Mr. Crawford is not a software engineer and does not work in the Servicer's information technology department.[9] Tr. Aug. Hrg. 66. Mr. Crawford was unable to testify regarding why the Servicer could not change its system or use a different system to accept electronic payments from debtors. The Court thus interprets Mr. Crawford's—and in turn, the Servicer's—position on "impossibility" to be a business preference and not a true statement concerning the development, refinement, or implementation of an online portal for borrowers who have filed bankruptcy.[10]

The two witnesses also had very different perspectives on the consequences of the Servicer's postpetition decision to change the Debtor's permissible payment methods.

The Debtor stated that not being able to use the online portal to submit her monthly mortgage payments created tangible and substantial hardships. She testified that there is not a

---

proper foundation, which was done. Mr. Crawford further explained that, once the "B" or "bankruptcy" code is placed on an account, only individuals in the Servicer's bankruptcy department may handle that account. *Id*. at 42–43.

[9] The Court notes that the Declaration of Jamison Young, attached to the Servicer's post-hearing brief, also addresses this issue. ECF 89-1. Mr. Young is identified as the Director of Contact Center Technology. *Id*. The Declaration primarily reinforces Mr. Crawford's testimony that the existing system cannot distinguish between nondebtor and debtor borrowers.

[10] The Court makes this observation only to clarify the kind of impossibility argued by the Servicer. The Court need not address this argument for purposes of this Opinion.

branch office close to where she lives, that she no longer has a car, and that she has had issues with mail being delivered as intended. Tr. Aug. Hrg. 23–26, 28–29. She also described negative experiences with telephonic payments. *Id*. For example, she described instances where she would be placed on hold for very long periods; she would be transferred among individuals to handle her payment; the individual with whom she was speaking would say that payment could not be accepted because she was in bankruptcy; and delayed confirmation of the payment being posted to her account. She also emphasized that the telephonic payment hours coincided with her work hours, requiring her to take time away from work or other responsibilities to try to make payments.

Mr. Crawford, on the other hand, said he believed that the Debtor had many alternative methods for submitting her payments in a timely manner. Tr. Aug. Hrg. 44. He also stated that the Servicer's policy and procedures, which directed debtors' calls and inquiries to employees familiar with bankruptcy protocols, were beneficial in that they helped debtors receive more accurate information regarding their account status. *Id*. at 45–47. Moreover, he explained the careful attention he and others at Cenlar provide to bankruptcy accounts to ensure compliance with the Code. *See generally id*. at. 41–44.

In addition to the parties' testimony, the Court reviewed the relevant documents. The original note governing the Debtor's mortgage loan is dated April 27, 2005, and is with Capital Mortgage Finance Corp., as lender (the "Note"). ECF 81-42, at 8. Under Section 3 of the Note, the Debtor agreed that she would make her "monthly payments at 810 Glen Eagles Court Suite 302, Towson, Maryland 21286, or *at a different place if required by the Note Holder*." *Id*. (emphasis added). The related Deed of Trust further provided that "if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security

Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, [or the like]; or (d) Electronic Funds Transfer." *Id.* at 15. The record contains no allegation or evidence that the Debtor paid by check or similar instrument or had any such instrument returned for insufficient funds.

The Servicer also produced a document containing terms and conditions for use of its online portal (the "Online Access Agreement"). ECF 89-2. Section 5 of the Online Access Agreement indicates that the Servicer "may terminate or suspend access to your loan online without notice if (a) you violate any of these Terms and Conditions or any other agreement you have with us, your lender or mortgage loan servicer, or the provider of any account from which you make payments . . . ." *Id.* Likewise, Section 17 provides that the Servicer "may at anytime suspend, terminate or make modifications, changes, or alterations to online access to [Debtor's] loan and any of the related services…without prior notice."[11] *Id.*

The Servicer did not offer the Online Access Agreement as evidence at the August Hearing, though Mr. Crawford did discuss the general terms of a borrower's use of the online portal during his testimony. The Servicer asserts that the exhibit (attached to a post-hearing brief) is offered to rebut certain issues raised at the August Hearing and is a public document available on a website. The Debtor objected to the admission or use of the Online Access Agreement, given its late submission in this matter. ECF 91, 93. The Court acknowledges the Debtor's concern but overrules the objection based on, among other things, the utility of the document, the lack of prejudice to the Debtor, its consistency with the parties' testimony at the August Hearing, and other grounds set forth by the Servicer.[12] *See, e.g.*, Tr. Aug. Hrg. 21–22, 35.

---

[11] The potential import of this language is discussed below in Part. II.B.

[12] As referenced above, the Servicer attached a Declaration of Jamison Young to its post-hearing brief to support, among other things, the terms of the Online Access Agreement. ECF 89-1, 89-2. The Servicer's post-hearing brief, the Declaration, and the Online Access Agreement were submitted, according to the Servicer, to address certain issues

The foregoing facts show an original set of loan documents that have changed hands and that were changed over time by the parties' course of conduct. Specifically, the "place of payment" term was either waived or modified by the parties through, for example, the Debtor making, and the Servicer accepting, her monthly mortgage payments through the online portal. In addition, Mr. Crawford's testimony and the Online Access Agreement show that the Servicer offered and the Debtor accepted use of the online portal. The parties' respective rights under their prepetition agreements are explored further below.

B.   Legal Analysis

The objective in every bankruptcy case is to balance the rights of the debtor and her creditors in a way that fosters the debtor's fresh financial start and maximizes returns to her creditors. In a chapter 13 case, the Code contains several provisions to facilitate this outcome, including the automatic stay of section 362, the confirmation provisions of section 1325,[13] and the discharge provision of section 1328.[14] The Debtor has confirmed her chapter 13 plan, and the automatic stay of section 362(a) remains in place—except as otherwise provided by the Code or Court order—during the Debtor's performance of her plan. The Servicer's conduct at issue in this matter occurred as of the petition date and has continued since that time.

---

not raised until the August Hearing. The Court does not agree fully with that understanding of the record. Nevertheless, the Court did allow both parties to submit additional information in support of their respective positions through post-hearing briefing, and the Online Access Agreement is publicly available at the website provided by the Servicer. ECF 92, at 3 (citing website and case law). For the most part, the Online Access Agreement and Mr. Crawford's testimony are consistent; the primary difference is the level of detail provided by the agreement. *See, e.g.*, Tr. Aug. Hrg. 40–41, 80–81 (explaining, among other things, that he did not recall all terms but noting how a customer signs up, can use the portal, and when her ability to use is affected). Moreover, the general terms of the Online Access Agreement appear consistent with the Debtor's testimony. *See, e.g.*, Tr. Aug. Hrg. 21–22.

[13] The confirmation provisions of the Code are primarily set forth in sections 1141, 1191, 1225, and 1325, depending on the chapter governing the debtor's bankruptcy case. Likewise, in a chapter 7 liquidation, the distribution protections for creditors are found primarily in section 726, which is incorporated as "the best interests of creditors test" in the confirmation provisions of chapters 11 (including subchapter V), 12, and 13.

[14] *See, e.g.*, 11 U.S.C. §§ 727, 1141, 1192, 1228.

1.  <u>Generally Applicable Code Sections</u>

The Debtor's primary argument in the Motion relies on section 105 of the Code. That section provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The scope of section 105(a) is the subject of considerable debate, but all courts acknowledge that the section "'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.'" *Law v. Siegel*, 571 U.S. 415, 421 (2014). According to the Debtor, the Court has the power under section 105 to compel the Servicer to grant the Debtor postpetition access to the online portal.

The Court is mindful of its equitable powers under section 105 of the Code and the equitable nature of many matters and proceedings in a bankruptcy case. The Court does not, however, read the language of section 105 as granting carte blanche authority to just "do the right thing." Rather, the Court believes that its actions must be tethered to the Code in some way; those actions must be "necessary or appropriate to carry out the provisions of the" Code. The Court thus must start "'where we always do: with the language of the statute.'" *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023) (citations omitted).

The Court asked counsel for both parties to consider the language of the Code and to identify any potentially relevant sections beyond section 105(a). The parties discussed several Code sections during the hearings and their subsequent briefing. The Debtor suggested in general terms that the Servicer's conduct violated the automatic stay of section 362(a) of the Code, which the Court interprets as a reference primarily to section 362(a)(3).[15] That section provides that the

---

[15] The Debtor's original Motion did not raise a potential stay violation. "Although the Debtors did not specifically request a finding that the Creditor's [action] was violation of the stay, the Court has the power to raise the issue sua sponte without a motion from a party in interest. *In re Jorge*, 568 B.R. 25, 37 (Bankr. N.D. Ohio 2017); *see also Walker v. Got'cha Towing & Recovery, LLC (In re Walker)*, 551 B.R. 679, 692–93 (Bankr. M.D. Ga. 2016); *222*

filing of a bankruptcy case "operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a). The latter phrase—"exercise control over *property of the estate*"—is a gating issue in this matter, which the Court addresses before turning to a potential violation of the automatic stay. 11 U.S.C. §§ 362(a)(3) (emphasis added), 541(a).

    2.  <u>Property of the Estate Under Section 541</u>

To consider the application of section 362(a)(3) in this matter, the Court must first analyze whether the Debtor's rights under the Note and the Online Access Agreement are property of the bankruptcy estate. Section 541 of the Code defines property of the bankruptcy estate to include "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "'This definition is meant to be very broad and includes practically every conceivable interest that a debtor may have in property.'" *In re Gifford*, 634 B.R. 909, 913 (Bankr. M.D.N.C. 2021) (citations omitted); *see also In re Sexton*, 508 B.R. 646, 656–657 (Bankr. W.D. Va. 2014) (collecting cases).[16]

---

*Liberty Assoc. v. Prescott Forbes Real Estate Corp. (In re 222 Liberty Assoc.)*, 110 B.R. 196, 200 (Bankr. E.D. Pa. 1990) (collecting cases)." *In re Carr*, No. 18-80386, 2019 WL 7840665, at *1 (Bankr. M.D.N.C. Nov. 18, 2019). In addition, the Court focuses on section 362(a)(3) because there is no evidence suggesting that the Servicer's conduct was an effort to collect a prepetition debt under section 362(a)(6), which would appear to be one of the only other relevant subsections of the stay.

[16] *See also, e.g.*, *In re Evans*, 527 B.R. 228, 234 (Bankr. E.D. Va. 2015) ("The question of what constitutes property of the estate is a question of federal law. *Bd. of Trade of Chi. v. Johnson*, 264 U.S. 1, 44 S.Ct. 232, 68 L.Ed. 533 (1924); *In re Drexel Burnham Lambert Grp. Inc.*, 120 B.R. 724 (Bankr.S.D.N.Y.1990). It includes both real and personal property interests of the Debtor. It includes all tangible and intangible interests in property and all causes of action. It applies to all property in the Debtor's possession as well as property held by third parties. It covers property wherever located. Section 541 of the Bankruptcy Code is intended to bring 'anything of value that ... debtors have in the estate.' H.R. Rep. 95–595, at 176 (1977)."). Moreover, "[b]ecause of the broad language in subsection (a) [of § 541], anything not specifically excluded under subsection (b) should be included as property of the estate." 5 COLLIER ON BANKRUPTCY § 541.01 (16th 2024). As such, courts have historically considered various intangible interests as property of the bankruptcy estate, even if non-bankruptcy law deems them merely "privileges" rather than property. *See, e.g.*, *In re Professional Sales Corp.*, 48 B.R. 651 (Bankr. N.D. Ill. 1985) (*vacated on other grounds*, 56 B.R. 753 (N.D. Ill.)). *See also In re CTLI, LLC*, 528 B.R. 359 (Bankr. S.D. Tex. 2015) (holding that business social media accounts are property of the bankruptcy estate).

It is a well-established principle that a debtor's prepetition agreements (as well as her rights under those agreements) generally become property of the bankruptcy estate under section 541 of the Code.[17] The transfer of the debtor's interests to the estate does not enlarge or diminish those interests. The property comes into the estate as it existed immediately prior to the petition date, and it vests *in toto*—the estate does not get only some of a debtor's interests in an agreement.[18]

Here, the Debtor's legal and equitable interests in the Note and the Online Access Agreement became property of the bankruptcy estate on the petition date under section 541(a) of the Code. Those interests became property of the estate notwithstanding any provision in the agreement "that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property." 11 U.S.C. § 541(c).

To determine whether the Debtor's ability to use the online portal was included in this transfer of property to the estate, the Court must consider the parties' prepetition agreements and applicable state law.[19] Although the online portal is property belonging to the Servicer, as

---

[17] *See, e.g.*, *In re Munoz*, 610 B.R. 907, 912 (Bankr. D.N.M. 2019) ("On filing a bankruptcy case, all the debtor's legal and equitable interests in property become property of the estate. § 541(a)(1). This includes the debtor's interests in executory contracts.") (citation omitted).

[18] 11 U.S.C. § 541(a), (c). Notably, there are exceptions in section 541 that keep property out of the estate, but those exceptions are not applicable here.

[19] *See generally Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."). The Note and related agreements are governed by Maryland law. ECF 81-2, at 20 (the Deed of Trust relating to the Note provides that the transaction is governed by the law of the jurisdiction where the Property is located). The Online Access Agreement states that it is governed by New Jersey law. ECF 89-2. "Because Maryland is, of course, the forum state, I must apply Maryland substantive law, including its choice of law rules, to determine which state's substantive law applies to the Agreement. . . . Notwithstanding this general rule, a contract's choice of law provision is unenforceable under Maryland [law] if the 'choice of law jurisdiction has no substantial relationship to the transaction, or there is a fundamental policy difference in the laws of another jurisdiction with a more substantial interest in the parties or the transaction.'" *Howard Bank v. Compu-Link Corp.*, 472 F. Supp. 3d 267, 273 (D. Md. 2020) (citations omitted). Here,

explained below, the Debtor has a contractual "right to use" that property.[20] Many courts have recognized such a contractual right to use as property of the bankruptcy estate under section 541(a) of the Code.[21]

The Debtor testified that she had the ability to use the online portal prior to the petition date,[22] that she could not access the portal after the petition date, and that use of the portal was valuable to her in performing her contractual obligations.[23] *See, e.g.*, Tr. Aug. Hrg. 21–22, 28–29.

---

although New Jersey's relationship to the transaction is nominal at best, as explained below, the Court could not discern any meaningful difference between Maryland and New Jersey law on the relevant issue.

[20] Courts generally recognize a "right to use" as part of the "bundle of sticks" (i.e., rights) associated with any tangible or intangible property. *See, e.g.*, *U.S. v. Cleveland*, 951 F. Supp. 1249, 1260 (E.D. La. 1997) ("In its broadest sense, a 'property' interest resides in the holder of any of the elements comprising the 'bundle of rights' essential to the use or disposition of tangible property or to the exercise or alienation of an intangible right.") (quoting *U.S. v. Bucuvalas*, 970 F.2d 937 (1st Cir. 1992); *see also T2 Techs., Inc. v. Windstream Commc'ns, Inc*., No. 14-CV-03151-MSK-KLM, 2016 WL 9735763, at *8 (D. Colo. Sept. 26, 2016) ("A subscriber's ' right to use ' a given telephone number has been recognized by several courts as a right of control or interest in the telephone number sufficient to support a claim for conversion."); *Campo v. United States*, 157 Fed. Cl. 584, 605 n.13 (2021), *appeal docketed*, No. 24-2312 (Fed. Cir. Sept. 12, 2024) ("Property interests may be real and personal, tangible and intangible, possessory and nonpossessory.") (quoting *Florida Rock Indus., Inc.*, 18 F.3d 1560 (Fed. Cir. 1994)). Neither Maryland nor New Jersey appears to have case law directly on point, and neither party cited any such case law. Nevertheless, both states appear to recognize a "right to use" as part of the "bundle of sticks" associated with property rights generally. *See, e.g.*, *Stansbury v. MDR Dev., L.L.C.*, 161 Md. App. 594 (Md. Ct. Spec. App. 2005); *Burns v. Bechtel Corp*, 212 Md. App. 237, 247 n.5 (Md. Ct. Spec. App. 2013) (Maryland law); *Hartz Mt. Industries, Inc. v. City of Jersey City*, 22 N.J. Tax 84, 92 (N.J. Tax Ct. 2004) (noting that the "right to use real estate" is a stick in the bundle of rights of ownership) (New Jersey law). Moreover, both states treat contract rights as tangible or intangible rights of value. *See, e.g.*, *Ali v. CIT Tech. Fin. Servs.*, 188 Md. App. 269, 293 (Md. Ct. Spec. App. 2003) (explaining that "courts generally have held [§ 541] to include whatever contract rights the debtor holds when the bankruptcy petition is filed.") (citing *First Sec. Bank v. Creech*, 858 P.2d 958, 961 (Utah 1993)); *Conteh v. Conteh*, 392 Md. 436 (Md. 2006) (characterizing contractual rights as marital property); *Registrar & Transfer Co. v. Director, Div. of Taxation*, 166 N.J. Super. 75, 80–81 (N.J. Super. Ct. App. Div. 1979); *Nagim v. New Jersey Transit*, 369 N.J. Super. 103, 119 (Hudson County Ct. 2003).

[21] *See, e.g.*, *In re Fontainebleau Hotel Corp.*, 508 F.2d 1056, 1059 (5th Cir. 1975) (stating that "[the] right of use is surely the most important attribute of possession, and the [debtor] clearly had the right of use as to these telephone numbers at the time the petition in bankruptcy was filed."); *In re Connecticut Pizza, Inc.*, 193 B.R. 217, 227 (Bankr. D. Md. 1996) (explaining that "[a] debtor's right to use the telephone number constitutes a possessory interest," and is thus protected by the automatic stay provisions); *In re 48th Street Steakhouse, Inc.*, 61 B.R. 182, 187 (Bankr. S.D.N.Y. 1986) (noting that although one may not have a proprietary right in a phone number, they do have a possessory interest, which is considered estate property in bankruptcy).

[22] The evidence shows that the Debtor had the ability to use the online portal before the petition date, and that her ability to use the online portal did not change until after the petition date. Tr. Aug. Hrg. 22; *see also, e.g.*, Tr. Aug. Hrg. 41, 43, 72, 82–83. *There is no evidence in the record to suggest that the Servicer denied the Debtor access to the online portal prior to the petition date or gave the Debtor any kind of notice—whether through the online portal or otherwise—of such potential denial prior to the petition date.* The Court thus does not address the situation in which a debtor's access to an online portal may have been terminated well before the filing of a bankruptcy case.

[23] Thus, to the extent property must have some "value" to constitute property of the estate, the Court finds adequate evidence in the Debtor's testimony to support this conclusion. *See, e.g.*, Tr. Aug. Hrg. 28–29.

This testimony demonstrated both the conduct of the parties, which changed the "place of payment" under the Note,[24] and the Servicer's offer of the online portal to the Debtor, which she accepted by setting up her online account. *Id.*; *see also id.* at 40–41, 81–82. The Debtor's testimony on use of the online portal was uncontroverted, and the Court found her testimony regarding challenges in making postpetition payments through other means credible. The Servicer's witness and papers indicate that any such "right to use" is merely a privilege or convenience and not a legal right. The Servicer's witness and papers also articulate the policy of restricting a debtor's ability to use the online portal because of, among other financial conditions, a debtor's bankruptcy filing.[25] *See, e.g.*, Tr. Aug. Hrg. 41, 43, 72, 82–83.

On this evidentiary record, the Court concludes that the Debtor had a prepetition contractual right to use the online portal. That right existed under the parties' prepetition agreement, namely the Online Access Agreement. That right held value for the Debtor in the context of her transactions with the Servicer. Whether that right to use is characterized as a separate legal or equitable interest, or a right arising out of the Online Access Agreement, the result for

---

[24] As stated above, the Note is governed by Maryland law. ECF 81-2, at 20. Under Maryland law, parties may modify a written contract through course of conduct or under principles of estoppel. *See, e.g.*, *Morris & Ritchie Assocs. v. H&H Rock, LLC*, No. 1824, Sept. Term, 2016, 2018 WL 679878, at * (Md. Ct. Spec. App. 2003) ("Parties may modify a contract by mutual consent, which can be shown by the parties' conduct.") (citing *DirecTV, Inc. v. Mattingly*, 376 Md. 302, 318 (Md. 2003)); *see also Tatum v. Richter*, 280 Md. 332, 336 (Md. 1977) (found that where a car dealer's own action "induced" a buyer to accept an alternative car worked a modification to the original contract to include the alternative car); *Patriot Constr. v. Vk Elec. Servs.*, 257 Md. App. 245 (Md. App. Ct. 2023) (modification found after conduct by contractor indicated payment); *Leaf Co. v. Montgomery County*, 70 Md. App. 170 (Md. Ct. Spec. App. 1970) (modification based on principles of estoppel).

[25] The Declaration of Jamison Young further states, "Cenlar restricts access to the Online Portal when a loan falls into default or when a borrower files for bankruptcy. *When a debtor files for bankruptcy, specific coding is used to prevent the debtor from further access to online features.*" ECF 89-1, at 2 (emphasis added); *see also* Tr. Aug. Hrg. 36, 42–43. The Servicer did not explain the different kinds of restrictions when a borrower's status changed. Based on the record, the term "restrict" in the context of a bankrupt debtor's access to the online portal means not being able to use the portal in any meaningful way—e.g., no online information and no online ability to make payments.

purposes of section 541 of the Code is the same. The Debtor's right to use the online portal and her interests in the Online Access Agreement came into the bankruptcy estate.[26]

3.   The Automatic Stay Under Section 362(a)(3)

Turning next to the automatic stay, courts generally acknowledge that a debtor's prepetition agreements are protected by the automatic stay of section 362(a)(3).[27] In addition, the Supreme Court has explained the scope of that subsection as applied to a creditor's postpetition conduct as follows,

> Taking the provision's operative words in turn, the term "stay" is commonly used to describe an order that "suspend[s] judicial alteration of the status quo." *Nken* v. *Holder,* 556 U.S. 418, 429, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (brackets in original; internal quotation marks omitted). An "act" is "[s]omething done or performed ... ; a deed." Black's Law Dictionary 30 (11th ed. 2019); see also Webster's New International Dictionary 25 (2d ed. 1934) ("that which is done," "the exercise of power," "a deed"). To "exercise" in the sense relevant here means "to bring into play" or "make effective in action." Webster's Third New International Dictionary 795 (1993). And to "exercise" something like control is "to put in practice or carry out in action." Webster's New International Dictionary, at 892. The suggestion conveyed by the combination of these terms is that § 362(a)(3) halts any affirmative acts that would alter the status quo [of estate property] as of the time of the filing of a bankruptcy petition.

*City of Chicago, Illinois v. Fulton*, 592 U.S. 154, 158 (2021).

---

[26] The Servicer's decision to deny the Debtor access to the online portal because of her bankruptcy filing is not sufficient to keep that right to use out of the bankruptcy estate. Rather, any such condition included in, or action taken under, the Online Access Agreement is invalid under section 541(c). 11 U.S.C. § 541(c). The Servicer's alleged right to terminate the Online Access Agreement at will is discussed further below.

[27] *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, No. 17 BK 3283-LTS, 2022 WL 17413011, at *3 (D.P.R. Feb. 7, 2022) ("a debtor's '[c]ontract rights are among the property interests protected by [section 362(a)(3)].' Metropistas Ord., 494 F. Supp. 3d at 101. See also MMM Healthcare, Inc. v. Santiago (In re Santiago), 563 B.R. 457, 472 (Bankr. D.P.R. 2017); U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.), 730 F.3d 88, 103 (2d Cir. 2013) ('[I]t is well-established ... that a debtor's contractual rights—including rights arising under post-petition contracts—are included in the property of his estate.') (quoting Slater v. Town of Albion (In re Albion Disposal, Inc.), 217 B.R. 394, 407-08 (W.D.N.Y. 1997)); 3 Collier on Bankruptcy ¶ 362.03[5][a] (Richard Levin & Henry J. Sommer eds., 16th ed. 2021) ('Executory contracts ... are considered a form of property of the estate. As property of the estate, the debtor's interests in such contracts ... are protected against termination or other interference that would have the effect of removing or hindering the debtor's rights in violation of section 362(a)(3).').").

The facts before the Court demonstrate affirmative action by the Servicer to change the status quo. Before the petition date, the Debtor could use the online portal to make her mortgage payments. After the petition date and because of the Servicer's action, the Debtor no longer had this right.[28] The Debtor's testimony further shows the impact on her and the estate by this change in the status quo.

The Court must consider, however, the "property" at issue and whether the Servicer's denial of the Debtor's access to the online portal under the parties' agreement is an exercise of control over that property. This is a difficult issue because, as noted above, the Servicer's action certainly changed the status quo of the parties' *performance* under the agreement. But did it also change the parties' rights in a way that terminated the agreement itself? *Compare In re UAL Corp*., 391 B.R. 791, 806 (Bankr. N.D. Ill. 2008) ("Breaching a debtor's contract right does not take control of the right from the estate; the estate fully retains the right and may enforce it in an appropriate legal action.") *with In re Clearwater Nat. Res., LP*, 421 B.R. 392, 400–01 (Bankr. E.D. Ky. 2009) ("In the within matter, the [contract] is an asset of the estate, and the *force majeure*

---

[28] *See In re DiPietro*, No. 17-CV-9423 (KMK), 2019 WL 457601, at *4 (S.D.N.Y. Feb. 5, 2019) (affirming the bankruptcy court's decision that the creditor's action of restraint of debtor's debit card and access to online account violated section 362(a)(3) and quoting with approval the bankruptcy court's statements that "'[t]he world has changed dramatically since' 1988, as online banking and debit card access 'have become primary over the course of the last 29 years.... The world is no longer amenable to waiting for payments while people go to the branch for money. It is no longer 1988.'"). Although *DiPietro* was decided before the Supreme Court's decision in *Fulton*, the court's analysis appears consistent with the Supreme Court's focus on affirmative action by the creditor to exercise control. As the court explained,

> The record clearly shows that Hudson Valley took actions to "exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Those actions — restraining DiPietro's online account privileges and debit card access — did in fact exercise control, as DiPietro was prevented from remotely accessing his account and was thus forced to repeatedly call Hudson Valley and visit its branches in person to remedy the problem.

*DiPietro*, 2019 WL 457601, at *5. The Court also acknowledges that some courts have held that a lender's termination of a debtor's online access to bank accounts does not violate the automatic stay of section 362(a). *See, e.g.*, *In re Spearman*, No. 16-30772, 2017 WL 943918, at *5 (Bankr. W.D. Ky. Mar. 9, 2017) (collecting cases). Most of these cases focus on whether such termination is an attempt to collect a debt and do not address whether the right at issue is property of the estate. The Court's determination herein is based on the particular facts of, and the law applicable to, this matter.

declaration constitutes an exercise of control over the contract so as to deprive the Plaintiff of its use and value.").[29]

The Court finds the facts of this matter akin to a contract termination, which did in fact remove the value of the contract from the bankruptcy estate. The testimony of both witnesses demonstrates the limited scope of the agreement at issue. Although related to the Note, the Online Access Agreement is an agreement between the Servicer and the Debtor. The Servicer expressly offered the use of its "sole and exclusive property" to the Debtor under that agreement, which the Debtor accepted by setting up her online account.[30] Based on the record, including the relevant testimony and contractual language, the Online Access Agreement is a stand-alone agreement that could be agreed upon, performed, and enforced separate from the Debtor's other agreements. The parties' testimony further demonstrates that the Servicer's restriction of the Debtor's access to the online portal prevented the Debtor from being able to use the portal and removed the value of the agreement itself from the estate.[31]

---

[29] For a further discussion of "mere breaches of contract" that do not violate the stay and contract actions that do, see *In re Benz*, 368 B.R. 861, 865 (B.A.P. 9th Cir. 2007) ("'In addition, the holding of *Computer Communications* is clear: unilateral termination of a contract by a creditor requires relief from the automatic stay. The Court declines to expand the holding of *Computer Communications* to breaches of contract not tantamount to a termination.'") (citations omitted).

[30] *See, e.g.*, ECF 89-2, at 2, 21–22; Tr. Aug. Hrg. 21–22, 28–29, 40–41, 81–82.

[31] The primary, if not only, subject matter covered by the Online Access Agreement is the Debtor's use of the Servicer's property for purposes of making payments through the online portal. Both parties have rights and obligations under the agreement, and the agreement contains its own default and enforcement provisions. ECF 89-2, at 2, 17–21 (page numbers are to Exhibit page and not agreement page); *see also Block v. Seneca Mortg. Servicing*, 221 F. Supp. 3d 559, 572 (D.N.J. 2016) (explaining the broad definition of adequate consideration under New Jersey law); *Ford v. Genesis Fin. Sols., Inc.*, No. CV DLB-23-2156, 2024 WL 1340356, at *5 (D. Md. Mar. 28, 2024), *appeal docketed*, No. 24-1341 (4th Cir. Apr. 19, 2024) (explaining contract formation and adequate consideration under Maryland law). Contrary to the Servicer's position in its post-hearing brief, the Online Access Agreement is a contract between it and the Debtor. Focusing on the substance of the Online Access Agreement, all operative provisions speak to rights and obligations of the Servicer and the Debtor. Although the preamble states that the lender is offering the service, the language of the agreement itself belies that statement. The Online Access Agreement provides, among other things, how the Debtor can "accept" the agreement, how the Servicer will provide notices and disclosures to the Debtor under the agreement, and that limit the Servicer's liability to the Debtor under the agreement. *Id.* at 2, 11–15. It also is arguably governed by state law different from that governing the Note, and specifically states that the Debtor's loans are "separate agreements." *Id.* at 2, 4. The Online Access Agreement further grants the Servicer extensive rights to use the Debtor's information and provides that any information transmitted to the Servicer through the online portal (including emails and chats) "shall be deemed and remain property of [the Servicer]," and the Servicer "will be free

The Court acknowledges that "mere breaches of contract" generally do not violate the automatic stay of section 362(a). The facts before the Court demonstrate more than a mere breach.[32] The Servicer's decision to deny the Debtor access to her online account effectively terminated the operative purpose of the Online Access Agreement; it was "tantamount to a termination."[33] Moreover, the Servicer cannot rely on its ability to terminate the agreement at will. Courts routinely hold that counterparties need relief from the automatic stay before terminating an agreement based on an at-will or similar termination provision. *See, e.g.*, *In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 760 (Bankr. M.D. Fla. 2009) ("The Auto Finance Companies' attempted cancellation of these contracts through the deactivation of the Ernie Haire Ford accounts is impermissible and invalid for another reason. Ernie Haire Ford's rights under these executory contracts are property of the bankruptcy estate, and, therefore, exercising a terminable-at-will provision is not permitted without relief from stay.").[34]

Considering the record in its entirety and based on the Servicer's affirmative action that removed the value of the Online Access Agreement from the Debtor and the estate, the Court determines that the Servicer violated the automatic stay of section 362(a)(3) of the Code.[35]

---

to use, for any purpose, any ideas, concepts, know-how, or techniques provided by [the Debtor] to [the Servicer] through this Loan Portal." *Id.* at 15–16.

[32] The parties did not raise any breach of contract or enforceability issues with respect to the parties' agreement and thus the Court does not address any such issues herein.

[33] *See Benz*, 368 B.R. at 865 (noting different treatment accorded mere breaches versus actions tantamount to termination).

[34] *See also In re Nat'l Hydro-Vac Indus. Servs., L.L.C.*, 262 B.R. 781, 786–88 (Bankr. E.D. Ark. 2001) (same; collecting cases).

[35] *See In re Computer Commc'ns, Inc.*, 824 F.2d 725, 731 (9th Cir. 1987) ("The automatic stay of § 362 barred Codex from unilaterally terminating the Agreement. Even if Codex had some reason for terminating the Agreement as a matter of contract law, it violated bankruptcy law by failing to obtain relief from the automatic stay."); *see also In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 760 (Bankr. M.D. Fla. 2009); *In re Clearwater Nat. Res., LP*, 421 B.R. 392, 400–01 (Bankr. E.D. Ky. 2009).

4.  Application of the Code to the Facts of this Matter

The Court finds itself confronted with a difficult situation: conduct by a party that violates the automatic stay but that does not, on the record, cause demonstrated or discernable monetary damage to the Debtor.

The primary (but not exclusive) remedy for an individual debtor subjected to a stay violation is found in section 362(k) of the Code. That section provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1). First, the Court observes that the Debtor did not specifically seek monetary damages under section 362(k); she requested only injunctive relief.[36] Second, the Court cannot disregard evidence that the Debtor had other means to submit her mortgage payment and did so. The Court understands that the Debtor would like to make her payments through the online portal, and the Court accepts her testimony that such access would make it easier for her to comply with her payment obligations. The Debtor did not, however, establish that she was foreclosed from making her monthly mortgage payments, including through an ACH (Automated Clearing House) or other electronic transfer from her primary bank account to the Servicer. In fact, the record shows that the Debtor is making her payments.

---

[36] In general, a debtor must show a willful violation of the stay that caused damages. A creditor's violation of the stay is willful if the creditor knew about the Plaintiff's bankruptcy case and intended the action taken against the debtor, the debtor's property, or property of the estate. *See, e.g.*, *James-Jenkins v. Sutton (In re James-Jenkins)*, No. 18-80074-HB, 2019 WL 354700, at *4 (Bankr. D.S.C. Jan. 24, 2019) ("A willful violation of the automatic stay occurs when a 'creditor knows of the pending bankruptcy petition and intentionally attempts to continue collection procedures in spite of it.'") (citations omitted); *In re Ojiegbe*, 512 B.R. 513, 520 (Bankr. D. Md. 2014) ("The Fourth Circuit Court of Appeals has stated that in the context of § 362(k)(1), willfulness does not require the specific intent to violate the automatic stay, only that the creditor knew of the stay and intentionally committed an act in violation of the stay.") (citations omitted). In calculating a damages award for a violation of the automatic stay, courts "traditionally view 'actual damages' as a broad umbrella term, including, but not limited to, lost time damages, out-of-pocket expenses, and emotional damages. *See In re Green Tree Servicing, LLC v. Taylor*, 369 B.R. 282, 288 (S.D.W. Va.2007) (emotional damages); *In re Hafer*, 2013 WL 5925167 at *7 (Bankr. E.D. Va. Nov. 5, 2013) (lost time damages); and *In re Ellett*, 2014 WL 4926006 at *4 (Bankr. S.D. Ind. Sept 30, 2014) (out-of-pocket damages)." *In re Ojiegbe*, 539 B.R. 474, 479 (Bankr. D. Md. 2015). The record before the Court is silent on these issues.

The Court does not reach this conclusion lightly; it acknowledges the practical hurdle for this Debtor created by the Servicer's action. The Court cannot, however, make a finding of monetary damages under section 362(k) on the record before it.[37] In so holding, the Court does not foreclose the possibility that in a matter with a different factual record, an award of monetary damages under section 362(k), if requested, might be warranted.

Similarly, the fact that the Debtor failed to establish monetary damages under section 362(k) of the Code does not excuse the Servicer's violation of the stay. In this matter, the Servicer's action that changed the status quo and violated the automatic stay is void ab initio.[38] Practically speaking, that result does little to provide relief to the Debtor or to address the ongoing nature of the Servicer's violation. The primary way to abate this violation is for the Servicer to restore the status quo and the Debtor's rights under the Online Access Agreement.[39] The Court cannot on the record before it, however, determine whether any such remedy is appropriate or warranted. As a result, and given the import of any such decision, the Court will provide the parties an opportunity to brief and be heard on those precise issues.[40]

---

[37] *See In re DiPietro*, No. 17-CV-9423 (KMK), 2019 WL 457601, at *4 (S.D.N.Y. Feb. 5, 2019) (affirming the bankruptcy court's decision finding a violation of section 362(a)(3) but reversing the bankruptcy court's damages award based on an insufficient factual record).

[38] Courts in the Fourth Circuit have consistently held that violations of the automatic stay are void. *See, e.g.*, *In re Parast*, 612 B.R. 710, 716 (Bankr. D.S.C. 2020) ("Any action in violation of the stay is void *ab initio*."); *In re Lampkin*, 116 B.R. 450, 453 (Bankr. D. Md. 1990) ("This court will adhere to the general rule that violations of the stay are void."); *Ellison v. C.I.R.*, 385 B.R. 158, 164 (S.D. W.Va. 2008) ("In the view of this Court, the clear weight of authority favors treating violations of the automatic stay as void as a matter of law."); *In re Weatherford*, 413 B.R. 273 (Bankr. D.S.C. 2009) (collecting cases).

[39] The automatic stay is a statutory injunction that prohibits certain conduct as of the petition date. A court generally may enforce the automatic stay as it would an order of the Court. *See In re Miller*, 22 B.R. 479, 481 (D. Md. 1982) ("The automatic stay provisions are treated as specific and definite orders of the Court. In re Mealey, 16 B.R. 800, 802 (Bkrtcy. E.D. Pa. 1982); In re Norton, 15 B.R. 623 (Bkrtcy.E.D.Pa.1981). Therefore, a wilful violation of the automatic stay is contemptuous."); *see also In re Kwok*, No. 22-50073 (JAM), 2024 WL 4100371, at *11 (Bankr. D. Conn. June 14, 2024) (permanently enjoining asset dissipation that would violate stay); *In re MP PPH LLC*, 660 B.R. 410, 430 (Bankr. D.D.C. 2024) (explaining enforcement of stay and use of an injunction as an alternative to the stay). In addition, as noted above, section 105 of the Code allows the Court to act in furtherance of the provisions of the Code, including the automatic stay of section 362(a).

[40] The Court acknowledges that the parties provided some evidence concerning the injunctive relief requested by the Motion, but that evidence and the parties' related arguments are necessarily incomplete. Neither party contemplated the appropriate relief, if any, in the context of an ongoing stay violation. The Court finds it only fair that the Servicer

As suggested at the beginning of this Opinion, the Court finds the Servicer's conduct troubling and inconsistent with the general policies underlying the Code and consumer protection laws.[41] The Court is, however, mindful of the competing interests at stake, the language of the Code, and the factual record before it. It can and will address only the facts and issues presented to it regarding this Debtor in this case. This decision cannot address the underlying policy issue, namely whether and when borrowers in financial distress should lose access to online accounts and portals that they have become accustomed to using. To the extent that electronic payment methods (such as the online portal) facilitate greater access to credit or success in bankruptcy,[42] the system might benefit from a *per se* rule that mandates such access. But any such change must be implemented by Congress or an appropriate regulatory agency.

---

have an opportunity to remedy this violation (for example by reinstating the status quo or otherwise providing similar access to the Debtor to facilitate electronic payments), or to present its position under case law governing ongoing stay violations and the Court's inherent powers to enforce a statutory injunction. *See, e.g.*, *In re Fina*, 550 Fed. Appx. 150, 154 (4th Cir. 2014) ("Section 105 authorizes a bankruptcy court to hold a party in civil contempt for violating an order of the court ...."); *see also U.S. v. Rylander*, 460 U.S. 752, 757 (1983) ("In a civil contempt proceeding such as this, of course, a defendant may assert a present inability to comply with the order in question.") (citations omitted); *South Carolina v. U.S.*, 907 F.3d 742, 765 (4th Cir. 2018) (citing *Rylander*, and noting that compliance must be actually impossible, "rather than merely difficult, inconvenient, or potentially impossible[.]"); *In re Chief Exec. Officers Clubs, Inc.*, 359 B.R. 527, 536 (Bankr. S.D.N.Y. 2007) ("The burden is on the disobedient party to demonstrate circumstances beyond its control, and that it took all reasonable steps, in good faith, to comply with the underlying order.").

[41] *See, e.g.*, *In re Martinez*, No. CIV.A. 1:06-CV-1130, 2007 WL 295406, at *3 (M.D. Pa. Jan. 29, 2007) ("Chapter 13 'is designed to encourage and make possible the payment, rather than the discharge of debts' and to 'enable an individual, under court supervision and protection, to develop and perform under a plan for the repayment of his debts over an extended period' free of harassment and other direct and indirect pressures.") (citation omitted); *In re Bellamy*, 132 B.R. 810, 813 (D. Conn. 1991), *aff'd*, 962 F.2d 176 (2d Cir. 1992) ("The Congressional intent of Chapter 13 was to enable an individual, under court supervision, to reorganize and repay his debts over a certain period of time under a structured rehabilitation plan."); ¶ 154-490 CFPB Substantially Strengthens Mortgage Borrower Consumer Protections (12 CFR 1024 and 1026).—part 1 of 3, Fed. Bank. L. Rep. P 154-490 ("Current comment 36(c)(1)(iii)-1 explains that a servicer may specify reasonable requirements for making payments in writing, such as requiring that payments be accompanied by the account number or payment coupon. Current comment 36(c)(1)(iii)-2 also explains that it should not be difficult for most consumers to make conforming payments."); *see also Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007).

[42] The benefits of "success" in bankruptcy are not limited to debtors—an online payment portal could facilitate maintenance of payments, minimize payment defaults, and reduce costs for lenders/servicers as well as debtors.

### III.    Conclusion

The Debtor had a right to use the online portal prior to the petition date under the Online Access Agreement. That right to use and the agreement itself held value for the Debtor and the estate. The Debtor's estate included this agreement, which was protected by the automatic stay under section 362(a)(3) of the Code. The Debtor did not, however, establish that the Servicer's action caused harm entitling her to monetary damages under section 362(k) of the Code; indeed, she did not request any such relief. Moreover, the Servicer's action in violation of the stay is void, and any relief to address that fact and the ongoing nature of the stay violation must await further hearing in this matter. The Court will enter a separate Order consistent with this Memorandum Opinion.

cc:      Debtor
         Debtor's Counsel
         Servicer's Counsel
         Chapter 13 Trustee
         U.S. Trustee

**END OF MEMORANDUM OPINION**